Thomson, J.,
delivered the opinion of the court.
On the 17th day of February, 1886, the appellee brought this action against the appellants and Hugh Butler, setting forth that on the 13th day of August, 1885, he entered into a contract with the defendant Wolcott acting for himself, and with the defendant Henderson by Wolcott as his agent, whereby he agreed to convey to Wolcott and Henderson, by a good and sufficient deed, the undivided three-sixteenths of the Pocahontas mining claim, and the undivided one half of the Roekport mining claim, both in the Tomichi mining district, Gunnison county, Colorado; and whereby the defendants Wolcott and Henderson agreed to execute to the plaintiff their two several promissory notes, one for $500, due sixty days after date, and one for $2,000, due one year after date; and that the deed and notes were to be deposited with the defendant Butler and held by him until the plaintiff should produce to him an abstract of title showing the plaintiff’s *362 right to convey the -property. When this should be done Butler was to deliver the notes to the plaintiff, and the deed to Wolcott and Henderson. The complaint alleges that in accordance with this contract the deed and notes mentioned were made and delivered to Butler, and that there were thereupon executed two instruments as follows :
“ August 13th, 1885.
“ Received of Amos Henderson and A. Wolcott two promissory notes payable to the order of Rudolph H. Johns, dated this day, one for the sum of five hundred dollars ($500) due 60 days after date, and the other for the sum of two thousand ($2,000) due one year after date, each with interest from date at the rate of (10) per cent, per annum, which said notes are to be held by me and delivered to said Rudolph H. Johns, who is to produce to me an abstract of title showing his right to convey to the said Henderson and Wolcott the undivided three-sixteenths (3-16) of the Pocahontas lode and the one half (1-2) of the Rockport lode, both of said lodes situated in Tomichi mining district, Gunnison county, Colorado, and a deed now in escrow conveying said titles to the said Henderson and. Wolcott.
“ Hugh Butler.”
“ August 13th, 1885.
“ Having this day executed and placed in escrow a deed conveying to Amos Henderson and Anson Wolcott the undivided three-sixteenths of the Pocahontas lode, and the undivided one-half of the Rockport lode, all situated in Tomichi mining district, Gunnison Co., Colorado, and the said Henderson and Wolcott having executed and placed in escrow their two .promissory notes aggregating twenty-five hundred dollars, all being left with Hugh Butler to be held by him until I produce a satisfactory title to said property, which I hereby undertake and agree to do. I further agree that in the meantime the said Henderson and Wolcott may enter into possession of said property and work and mine the same.
“ Rudolph H. Johns.”
*363 The deed was a quitclaim, and the notes were signed “Amos Henderson by A. Wolcott;” “A. Wolcott.” It is further averred that the plaintiff did on the 22d day of October, 1885, produce to Butler an abstract, and other evidences of title, showing his right to convey the property, with which Butler was satisfied, and so expressed himself to the parties, as showing a good title in the plaintiff; yet, nevertheless, at the instigation of Wolcott and Henderson, Butler refused and failed to deliver the notes to the plaintiff. The prayer is for judgment against Butler that he deliver the notes to the plaintiff, and for other relief.
Henderson demurred to the complaint for the reason that it did not state facts sufficient to constitute a cause of action ; and from a decision overruling his demurrer appealed to the supreme court. That court held the complaint good. Henderson v. Johns, 13 Colo. 280.
Mr. Justice Hayt, who delivered the opinion, after reciting the complaint, stated the question presented by the demurrer, and the contentions of the parties concerning it, thus: “ To whom was this title to be satisfactory ? The bill is framed upon the theory that it was to be satisfactory to Mr. Butler alone, and an averment is inserted to the effect that the abstract thereafter produced satisfied Mr. Butler that the title was sufficient; while the appellant claims that the grantees in the deed, i. e., himself and Wolcott, are made the sole judges of the sufficiency of the title.” After discussing the contract as set out in the complaint, and the written instruments executed in pursuance of it, the conclusion reached is given in the following language: “ It follow's from the construction which we place upon the contract that, when appellee produced such an abstract of title as satisfied Mr. Butler of his right to convey, the condition upon which the delivery of the notes was agreed to be made was fully met; and, having alleged these facts in his complaint, the pleading must be held sufficient in this particular.” The decision of the lower court upon the demurrer having been affirmed, Henderson answered, denying the authority of Mr. Wolcott to *364 act for him in making the contract, or in signing his name to the notes, and averring that the plaintiff never had a title to' the property which was good or satisfactory. The answer of Wolcott denied title in the plaintiff, denied the contract as it was set out in the complaint, denied that the plaintiff, on the 22d day of October, 1885, or at any other time, produced to Butler an abstract or other evidence of title showing his right to convey the property, and specifically alleged a number of defects in the plaintiff’s title by reason of which it was not good or satisfactory, concluding as follows:
“ Fourth. And for a further defense this defendant alleges on information and belief, that on the 7th day of October, 1885, in a certain suit then pending in the county court of Gunnison county, wherein Philip H. Eastman was and is plaintiff, and said R. H. Johns was and is defendant, a writ of attachment was duly issued against said Johns’ property for the sum of $386.22, which said attachment was on the same day levied on all the interests of said Johns in said Rockport and Pocahontas lode mining claims, which attachment and the lien thereof thereon remains in force and effect against, and a lien upon, all his interests in said claims, alleged in said complaint and described in said instruments therein set forth, signed by said Johns.” On motion of the plaintiff the portions of the answer alleging defects in the title were all stricken out except the foregoing. Afterwards Wolcott filed a supplemental answer, setting forth the recovery of judgment by Eastman in his attachment suit, the issue of execution upon the judgment, the sale of the attached property to the attachment plaintiff for $457.40, the failure of Johns to redeem the property from the sale, and averring that it had become the property of Eastman. A replication was filed and the case tried. The result was a decree in the plaintiff’s favor, from which both the defendants appealed.
Henderson’s counsel meets us with a voluminous argument against the right or authority of Wolcott to represent his client in the transaction. It is not, in our opinion, important whether Wolcott had authority for the purpose or *365 not, and with a few observations we shall dismiss the subject. As to whether such authority was originally given, the statements of the two men are in direct conflict. Wolcott testified that it was, and Henderson that it was not; but the testimony of the latter shows a subsequent ratification, with full knowledge of the facts, of all that Wolcott did. Upon the testimony of either, Henderson was bound.
■ The testimony of the parties as to the terms of the contract in accordance with which the two writings were drawn is conflicting; it being asserted on the one side, and denied on the other, that Mr. Butler was to pass upon the title, and when it was satisfactory to him, deliver the notes to Johns and the deed to Wolcott and Henderson. Mr. Butler himself said that the conversation was that he was to examine the title, and if he found it good deliver to each side the papers to which it was entitled. We shall therefore let this matter rest where it is; and, taking for our starting point the interpretation given by the supreme court to the contract, and the instruments as they appeared in the complaint, proceed to an examination of the evidence, to ascertain at what time, if ever, the plaintiff was entitled, in accordance with the letter and spirit of his contract, to exact the notes from Butler.
The first expression by Mr. Butler concerning the title on which he was to pass is found in the following letter from him to Mr.-Wolcott:
“Denver, Colorado, Sept. 17,1885.
“Hon. Anson Wolcott,
“ Wolcott, White County, Indiana.
“ Dear Sir: Pursuant to the understanding of August 13th from you and Mr. R. H. Johns, when at my office, I sent for a continuation of the abstract of the Pocahontas lode and also for an abstract of the Rockport lode. They were sent me by the recorder of Gunnison county with a certificate of their correctness down to Aug. 17th. The abstract of the Pocahontas shows that the deed to Eastman from Phelps should *366 have been 3-16ths instead of 3-8ths, thus confirming Mr. Johns’ idea.
“ I have examined the abstracts and they show title in Mr. Johns authorizing him to convey 3-16ths of the Pocahontas lode and 1-2 of the Rockport lode to you and Mr. Plenderson as per the bargain between you. At the same time there are some matters in the abstract which I deem it my duty to acquaint you of at this time. Concerning the Pocahontas, Cams, the locator deeded 1-2 to A. F. Post in 1881, the year after the location. Subsequently he deeded the other half to Philip H. Eastman. Eastman has held his half since that time, so that the interest which Mi'. Johns is to convey to you comes out of Post’s half. Now Post is apparently divested of his title in two ways. One is by forfeiture proceedings on the part of Cams for failure on the part of Post to pay his annual assessments for 1881 and 1882. This forfeiture proceeding begins with affidavits in 1882 and ends in affidavits in April, 1883. Whether or not the forfeiture proceeding was sufficient to take Post’s title from him and put it in Cams, is a question that I cannot answer satisfactorily from the record.
“ The proceeding is a risky one at best, and depends on a good many matters not satisfactorily shown in the abstract. But Post gave a deed October 23d, 1883, to Timothy Mahannan after the forfeiture proceedings were begun by Cams.
“ Cams also deeded an eighth to Mahannan September 4, 1883, and then Mahannan deeded to Cams September 7,1883, the undivided one-half. This would confirm the title safely in Cams to the Post half in September, 1883? but for one thing: that is that the Post deed to Mahannan was not acknowledged, so there is no sufficient evidence of his execution of the deed. Post might claim, so far as the abstract shows, that neither the forfeiture proceeding nor this deed divested him of his interest. Of course if he did make the deed it could be proven by outside evidence. I assume the facts exist to take the title out of Post. At all events the subsequent transfers seem to assume that Cams became aud *367 was the owner of that half interest, again, on and after September 7,1888. Cams thereafter gave a trust deed to Thomas George, on the three-eighths. The trust deed was given January 9,1885, to secure $1,000, due in six months at 5 per cent, per month. George, the trustee, sold out this title and gave a deed to it to George S. Phelps, on April 80,1884. As you will notice the six months had not expired, so the default must have been in the payment of interest. If that was the fact, and the trust deed provided for the sale upon a default in the interest, the trustee’s deed would be all right. The abstract does not show the facts in the matter. Phelps deeds thereafter three-sixteenths to Eastman and three-sixteenths to R. H. J ohns and this is how Mr. J ohns gets his title. It may be said in passing that Phelps took his title in the name of George S. Phelps, trustee, and deeds it in the same way to John’s. This would indicate that the deed to him might have put the title in him as trustee for certain purposes and we would then have to inquire whether the deed from him was in conformity with his trust. But there was some talk concerning this when you were here, and my understanding was that the use of the word ‘ trustee ’ meant nothing in this transaction. In July and August, 1884, there are two lis pendens of record in suits by Cams against Thomas George, Eastman and others. There is no disposition of these suits shown in the abstract, but I understand you were acquainted with the matters and understood them fully. There is also an agreement dated the 17th day of November, 1888, recorded January 18, 1884, between Cams on the one part and Cook and Gifford on the other, reciting that Cams had placed his deed in escrow for an undivided one-fourth. Conditioned to be returned on the payment by him of $726, on or before July 1,1884. The abstract does not show any disposition of this deed, but in any event it cannot affect any purchaser under the trust deed to George which was recorded first. These are all the matters that need to be noted. As stated above the conveyance indicates that the title has been brought *368 down to Mr. Johns al] right. At the same time I thought it best to notify you of these questions.
“The Roelcport lode is shown to be one-half in R. H. Johns by deed from George S. Phelps, trustee. The title is straight as shown by abstract. There is a notice of Ks pen-dens July 24, 1884, in a suit by Cams against George, Eastman and others as stated above. I believe you are acquainted with the nature and disposition of these suits. Mr. Johns was in the other day and I told him I would write to you and ask for your authorization to hand him the notes and take the deed for you. If you are satisfied please write me to hand over the notes to Mr. Johns and whether I shall send the deeds to you or send them to Gunnison county for recording.
“Yours respectfully,
“ Hugh Butler.”
It is quite apparent that when the foregoing letter was written, Mr. Butler was not satisfied with the title which had been exhibited. The suggestions of want of data to enable him to determine upon the validitj^ of certain transfers, and the fact that he wrote the letter, instead of at once delivering the notes to Johns, prove that to his mind the title was at least doubtful. But in his testimony, speaking with reference to the subject-matter of the letter, he said: “ I remember that in the examination of the title the question occurred to me whether Mr. Post’s title had been taken out of him by certain forfeiture proceedings. I did not think it was a very good title, and I advised that a conveyance be had from Mr. Post if one could be had. The abstract did show a conveyance from Mr. Post, but it was not acknowledged, and I was not satisfied with it.” Mr. Wolcott answered Mr. Butler’s letter, saying that he had sent it to Mr. Henderson, that he might have such examination made as would satisfy him that the title was safe, and directing Mr. Butler not to deliver the notes. In pursuance of Mr. Butler’s advice, Mr. Johns procured the necessary deed from Mr. *369 Post, and submitted it to Mr. Butler on October 22,1885. On that day Mr. Butler sent the following telegraphic message to Mr. Wolcott: “Johns has obtained new deed from Post, properly acknowledged. He demands delivery of notes. Shall I deliver them to him ? ” Mr. Wolcott telegraphed in reply: “ Please do not deliver notes; will write objections.” His letter written October 23,1885, contained the following: “ Your first letter as to the Johns title to the Pocahontas, indicates some other questions to be examined besides the Post deed. This letter I sent to Mr. Henderson to have these questions examined. This was before I was aware he objected to the purchase. I will write to-day to Mr. Henderson requesting him to return me that letter of yours, that the questions therein indicated by you may be inquired into. * * *• As soon as I receive the letter from Mr. Henderson I will write to you again.” On October 23, 1885, Mr. Butler wrote to Mr. Johns as follows:
“Dear Sir: According to promise, I telegraphed Mr. Waller last night, inquiring if the suits had been dismissed, and I also telegraphed Mr. Wolcott that you had procured a satisfactory deed, duly acknowledged, from Mr. Post, and asking instructions from him about delivering the -notes to you, stating that you demanded the same. This morning I received a dispatch from Mr. Waller, stating that one suit had been dismissed, on the 25th of August, 1884, and the other on the 24th of February, 1885, which, of course, was satisfactory. At the same time, I received a telegram from Mr. Wolcott, as follows: ‘ Please do not deliver notes. Will write objections.’ This, to me, was quite a surprise, and, I confess, it produced a feeling of disgust. I do not understand why Mr. Wolcott, at this late day, and under all the circumstances, can have any objections to make.' I write to him by to-day’s mail, asking him, if he has not written, to write at once, as I do not propose to be trifled with in this matter. As soon as I hear from him I will let you know.
“ Yours respectfully,
“ Hugh Butlel.”
*370 It appears from Mr. Butler’s testimony that Mr. Waller was clerk of the district court of Gunnison county, and that the two suits mentioned were those referred to in his letter of September 17th, as Cams v. Thomas George, Eastman and others. Correspondence continued between Mr. Butler and Mr. Wolcott until November 11, 1885, when Mr. Butler wrote a letter to Mr. Wolcott, in which the following occurs: “ Remembering the conversation which took place between Mr. Johns and yourself in my presence, and the correspondence which has passed between us, I am of the opinion that Mr. Johns has fully complied with his part of the contract, and that he is entitled to the delivery of the notes. I think he has fairly met all the conditions and requirements of his agreement, and that the title tendered him is satisfactory.” The foregoing letter contains the first expression from Mr. Butler to Mr. Wolcott that the title was satisfactory, although it would appear from his letter to Mr. Johns that he had become satisfied with the title on the 22d or 23d of October.
But, as appears from the evidence, on the 9th day of October, 1885, Philip H. Eastman brought suit against Mr. Johns in the county court of Gunnison county, in which suit he caused a writ of attachment to be issued. The writ was, on the same day, levied upon the three sixteenths interest of Johns in the Pocahontas claim, and his one half interest in the Rockport claim; and on October 12, 1885, the summons issued in the suit, and a copy of the writ of attachment, were served upon him. The evidence shows that this suit proceeded to judgment against Johns, that execution was issued upon the judgment, and the property levied upon by the writ of attachment sold to the attachment plaintiff for $457.40, who, after the period allowed for redemption had expired, received a sheriff’s deed for the property. The sheriff’s deed was executed before the filing of Wolcott’s supplemental answer. The evidence disclosed this condition of fact: that at the time when Mr. Johns produced to Mr. Butler the new deed from Post which had been deemed necessary to make the title satisfactory, he knew that suit had *371 been brought against him, and the property attached. He was served with summons and received a copy of the writ of attachment ten days before that time. The levy of the writ was after the date to which the abstract had been brought down, so that it could not appear there; and as to anything affecting the title which occurred after the date to which the abstract was certified, Mr. Butler’s information, if he received any, must have come from some other source.
According to the agreement, as set forth in the complaint, to entitle the plaintiff to the possession of the notes he must produce to Mr. Butler evidence of title showing his right to convey the property, and Mr. Butler must be satisfied that the evidence produced showed a good title in him. The complaint alleged, and the answer denied, that the plaintiff did produce such evidence of title. The performance by him of this condition of the agreement was therefore directly in issue, and the burden of proof was upon him.
The evidence of title which the plaintiff obligated himself to submit would necessarily include everything of record which materially affected the character of the title; and the right, or want of right, to convey, would be a conclusion from that evidence. It therefore devolved upon the plaintiff to show that Mr. Butler was made acquainted with every matter which appeared upon the record concerning the title, whether favorable to it or not. Now we can find no evidence that at the time Mr. Butler expressed himself satisfied with the title, he had any knowledge of Eastman’s attachment. On October 22d the plaintiff submitted to Mr. Butler the deed which he had procured from Post. He knew some days previous to that time that the attachment had been-levied upon the property, and he could then have informed Mr. Butler of the fact; but although he testified fully as to other matters, he did not say that he then, or ever, advised Mr. Butler of the attachment, and Mr. Butler was equally silent upon the subject. The objections made by Mr. Butler to the title as shown upon the abstract had been obviated. Mr. Butler’s testimony and his letters indicate'that he sup *372 posed the defects he had called attention to were the only ones that existed, and that his decision was based upon that supposition. But here was an incumbrance created after the abstract was made, and after Mr. Butler had suggested steps for perfecting the title which it showed, but before his suggestion had been acted upon, and therefore before he passed judgment upon the title. A new condition had arisen, a knowledge of which was essential to the validity of the decision which he was to render, and by reason of the want of evidence that the new condition was brought to his knowledge, a material allegation of the complaint — an allegation necessary to the statement of a cause of action — was not sustained. The fact that Mr. Butler did pronounce in favor of the title is of no consequence. If his decision was made in ignorance of a material fact, it was without value, and did not bind the parties.
But it is contended that notwithstanding the silence of Johns and Butler upon the question of the latter’s knowledge, it appears from other portions of the evidence that Butler as a matter of fact was made aware of the attachment. We do not think the contention is borne out by the record. Mr. Wolcott testified that he first learned of Eastman’s claim against Johns when he was at Tomichi making an option purchase from Eastman and a Mr. Barber. He made this purchase, as the testimony shows, on the 7th or 8th of August, 1885. Mr. Eastman then gave him notice of a claim and a lien. His next information of the claim was received on the 18th of August, at the time of the transaction with Johns. He then talked it over with Johns, but he did not think that anything was said about it to Butler. Subsequent to the attachment, he saw a notice of it in a White Pine newspaper, and afterwards informed Mr. Butler of it by letter. He could not state definitely when he ascertained that Eastman was prosecuting his claim against Johns by attachment or otherwise, but it was earlier than November 18th. He said he learned it as soon as the attachment was made. The record contains *373 a communication from Eastman to Wolcott, without date, as follows:
“A. Wolcott, Esq., Dear Sir: This, is to notify you that I have attached the Johns’ interest, three-sixteenths in the Pocahontas mining claim on Clover mountain.
“ Phil. H. Eastman.”
This was sent by Wolcott to Butler with the following appended note:
“Wolcott, Indiana, December 11th, 1885.
“ Hugh Butler, Esq.,
“Denver, Colo.
“ Dear Sir: — The above is a copy of a notice received by me by the mail this morning.
“Yours truly,
“A. Wolcott.”
The foregoing is substantially the evidence on the question of Butler’s knowledge. There is no doubt that at the time the notes and deeds were placed in Butler’s hands Eastman was asserting a claim against Johns upon the property or a portion of it, and that Wolcott and Johns were both advised of it, and had a conversation concerning it. There is no evidence that Mr. Butler heard their conversation. But although Eastman had notified Wolcott that he had a lien, it does not appear that the alleged lien was a matter of record. If it was, it should have been shown upon the abstract, because the abstract was brought down to August 17th, nine or ten days after Eastman gave the notice. But it does not appear, and it is not claimed, that the abstract disclosed anything concerning it. Whatever this may have been that Eastman called a lien, it was not the lien created by the attachment, for the reason that the attachment lien had no existence before the 9th of October. It is immaterial whether B utler knew that Eastman was claiming a lien in the early part of August or not, because if it was not a matter of record it did not affect the title. No complaint is made on account *374 of this supposed lien, and the evidence concerning it has no proper place in the record.
But the attachment lien which was afterwards secured was a charge upon the property, binding it for the payment of whatever sum Eastman might recover; and while it existed Johns could not convey a good title. Now, in so far as this record discloses, the only knowledge which Mr. Butler ever obtained of the fact of the attachment was derived from Mr. Wolcott in December. There is no evidence whatever from which it can be found that he knew of it earlier. But he had already given his decision in favor of the title ; he made no expression upon the subject afterwards, and it was in reliance upon that decision that this suit was brought. When we consider that it was the duty of Mr. Johns himself to acquaint Mr. Butler with the fact of the attachment, and that he alleged, as it was necessary he should, that he produced the required evidence of his title to Butler, we would not conceive ourselves bound, in the absence of proof on the part of Mr. Johns that he made the necessary showing of title, to indulge in a remote and farfetched inference that Mr. Butler possibly gathered a knowledge of the attachment from some outside source, even if there were anything in the record — which there is not — from which such inference might be drawn.
Another point made is that Eastman, before he levied his attachment, had knowledge of the transaction between Johns and Wolcott, and that therefore the attachment did not bind the property as against them. The position of counsel will perhaps be better understood by quoting their language. It is as follows : “ Eastman having as he testified, first called the Johns’ interest to Wolcott and Henderson, and having arranged his lien satisfactorily with them provided they were able to buy the Johns’ interest, and then having entered into the possession of Johns’ interest as their agent, was charged with actual knowledge of Wolcott and Henderson’s purchase, and it was just as effective against him and his attachment as though the deed had been put on record long *375 before the attachment papers were issued.” The record makes it clear that Eastman knew that there was a transaction of some kind between Johns and Wolcott concerning the property. Whether he was aware of its details does not appear. It was also shown that Eastman had charge of the property for Wolcott, Henderson and himself (he being the owner of an interest in each of the claims) from August 17th to September 25th, in pursuance of a written contract between himself and Wolcott and Henderson; but there is nothing in his testimony, or in the testimony of any other witness, or in the agreement, concerning any arrangement with them of his alleged lien. The question then is, what was the effect upon him of the notice which he had of the transaction ? Counsel call the transaction a purchase, and the argument upon the effect of his knowledge is based upon the hypothesis that it was a purchase. What the transaction was, and its legal effect as between the parties to it, and upon others having knowledge of it, can be best determined by reference to the law of escrow, by which it was unquestionably governed. The deed to the property, and the notes for its price, were placed in the hands of Mr. Butler to be held by him until the performance of a certain condition by Johns. Upon the performance of that condition Butler was to deliver the deed to Wolcott and Henderson, and the notes, to Johns, and in the event of the refusal or impossibility of performance, it would have been his duty to return the papers to the parties respectively from whom he received them. Until performance the instruments were entirely ineffective for any purpose; there was no conveyance, and there was no obligation upon the notes; the estate with all its incidents remained in Johns; if he had died in the meantime it would have descended to his heirs ; it was subject to attachment for his debts, and a creditor levying upon it would hold it in preference to the grantees named in the deed. Warville on Vendors, 515; 3 Washburn on Real Estate, 302; Prutsman v. Baker, 30 Wis. 644; Smith v. Bank, 32 Vt. 341; Jackson v. Rowland, 6 Wend. 667; Teneick v. Flagg, 29 N. J. Law, *376 26; Cagger v. Lansing, 43 N. Y. 550; Jackson v. Catlin, 2 Johns. 248.
By the depositing of the papers with Butler, Wolcott and Henderson acquired no interest, legal or equitable, in the property, and Johns no right in the notes. Hot until Butler was authorized by the conditions of escrow to deliver the deed to Wolcott and Henderson, and the notes to Johns, could any right be vested in any of the parties. The transaction was therefore not a purchase, and whatever knowledge Eastman may have been chargeable with, was not, because it could not be, knowledge of a purchase. The facts of the transaction were all that it was possible for him to know, and those facts left the property in Johns, subject to attachment for his debts. By his attachment Eastman secured a lien upon the land, and if Wolcott and Henderson had subséquently accepted the deed, the title would have vested in them subject to the lien.
We do not think that the situation was in any way altered by the fact that Wolcott and Henderson went into possession of the property and did work upon it. It would not bind them to accept an imperfect title, or change the terms upon which the deed or notes were to be delivered; and it •did not relieve Johns from the performance of any condition ¡upon which his right to the notes depended. It gave them ¡no ownership in the property, and as the possession was taken ¡by the permission of Johns, it could not be made the foun■dabion of any new claim in his favor. Upon the performance bj' him of the conditions of his contract there would be .an absolute sale of the property, and Wolcott and Hender-son -would be its owners; but until condition performed there ■was bo sale, and Wolcott and Henderson had no title or ¡interest in -the property, whether they went into possession • or not. 'This transaction must not be confounded with a .contract if or dike sale of real estate, by virtue of which the vendee .acquires an equitable title. In such a case, if the ■ contract is .not in writing, the delivery of possession under it takes it out of ithe statute of frauds, and equity will decree *377 its specific performance, notwithstanding it was by parol. This was a contract by which certain instruments were placed in Butler’s hands to be by him delivered to the proper parties provided a specified condition was performed. If the condition was performed the instruments were deliverable, and title passed ; otherwise not, and the parties retained their original positions; Johns parted with nothing, and Wolcott and Henderson received nothing. If the condition had been performed and Butler refused to deliver the papers to the parties to whom they belonged, the remedy of Wolcott and Henderson was not by suit against Johns to compel specific performance of a contract of sale, but by an action against Butler to obtain possession of the deed; and in like manner Johns must proceed against Butler for the possession of the notes.
It is further stated that Wolcott and Henderson ought not to be heard to complain of the incumbrance, because they might have removed it by payment, — deducted the sum paid from the purchase price. Counsel do not inform us how, in any proceeding for the enforcement of the agreement of escrow, brought by either party, — and there could have been no right of action in either except upon that agreement, —Wolcott and Henderson could have compelled any concession from Johns on account of such payment, if it had been made. In the case of an executory contract for the sale of land, of which specific performance may be decreed at the suit of either party, the purchaser may apply purchase money remaining in his hands to the extinguishment of liens, and have his payment allowed in the decree in deduction of the amount which would otherwise be due to the vendor; but even in such a case discharge of the incumbrance is optional with the purchaser. Where he has agreed for a good title, he is under no obligation to accept a deed to incumbered property. Warville on Vendors, 943, et seq.
Certainly Wolcott and Henderson were not obliged to accept this deed from Butler except upon the agreed conditions ; but if they had taken it upon themselves to pay off *378 Eastman’s claim, we do not understand how they could have made the payment a set-off or counterclaim in a suit by Johns against Butler for the possession of the notes.
Counsel say that the real reason why Wolcott and Henderson refused to accept the deed was that upon exploration of the ground the3r found, that it contained no mineral and was worthless. In a proceeding of this kind, it is facts and not motives that are to be inquired into. If the conditions of escrow were fulfilled, Wolcott and Henderson became liable upon the notes, however worthless the property proved to be; but if the conditions were not fulfilled, they incurred no liability, and no motive by which they might have been actuated could change either the obligation or rights of Johns. : The judgment must be reversed.

Reversed.