UNITED STATES of America,
Plaintiff,

v.

GENERAL RESOURCES, LTD., Edward L. MacClain, and Samuel C. Pandolfo, Jr., Defendants.

UNITED STATES of America,
Plaintiff,

v.

J. S. CARTER, Rodney A. Pandolfo, and Samuel C. Pandolfo, Jr., Defendants.

UNITED STATES of America,
Plaintiff,

v.

Gerald YAW, Defendant and Designated Third-Party Plaintiff,

v.

Sam Parker PANDOLFO, Third-Party Defendant.

UNITED STATES of America,
Plaintiff,

v.

J. S. CARTER, Samuel C. Pandolfo, III, and Samuel C. Pandolfo, Jr., Defendants.

UNITED STATES of America,
Plaintiff,

v.

William E. ROBERTS and Samuel C. Pandolfo, Jr., Defendants.

UNITED STATES of America,
Plaintiff,

v.

H. P. CROW, Defendant.

Civ. A. Nos. 6195–6199, 6216.

United States District Court
D. Colorado.

May 7, 1962.

Lawrence M. Henry, U. S. Atty. for District of Colorado, and Arthur L. Fine, Asst. U. S. Atty. for District of Colorado, Denver, Colo., for plaintiff.

Jacob H. Chisen, Denver, Colo., for defendant Edward L. MacClain.

McLean & McLean, Denver, Colo., for defendants Samuel C. Pandolfo, Jr., Rodney A. Pandolfo, Sam Parker Pandolfo, Samuel C. Pandolfo, III, and H. P. Crow.

Thomas D. Smart and James F. Culver, Denver, Colo., for defendant J. S. Carter.

Isaac H. Kaiser, Denver, Colo., for defendant and third-party plaintiff Gerald Yaw.

John H. Schultz, Denver, Colo., for defendant William E. Roberts.

DOYLE, District Judge.

A hearing was held on April 23, 1962, and on that occasion counsel argued various legal issues raised in the above captioned civil actions. Many of the facts have been stipulated and it appears from the agreed statements that on December 1, 1955, the Royal Hotel, Inc., at Las Vegas, Nevada, was delinquent in the payment of federal withholding, F.I.C.A., and cabaret excise taxes in the approximate amount of $97,000.00.

On December 2, a proposal was made to the Internal Revenue Service at Las Vegas, Nevada, whereby the Royal Hotel would deliver to an escrow agent promissory notes amounting to $101,900.00, to be held by the escrow agent as security for the fourth quarter's taxes of Royal for the year 1955. A further provision of the escrow arrangement was that the notes would be delivered to the Internal Revenue Service on January 31, 1956 if the delinquent taxes were not paid to a current basis.

Although some payments were made during the month of December, 1955, there remained a very substantial unpaid balance on January 4, 1956, and on this date an involuntary adjudication in bankruptcy was filed against the Royal Hotel in the United States District Court for the District of Nevada.

On January 6, the Commissioner of Internal Revenue made an assessment against the Royal Hotel for all the unpaid taxes. Later, the Internal Revenue Service filed a claim in a bankruptcy proceeding and represented that the United States held no security for the payment of the debts. This was a form claim.

It would also appear from the stipulation that Internal Revenue Service had in its possession a balance sheet of the Royal Hotel prior to the mentioned escrow agreement, showing that the Royal Hotel was then insolvent.

Various other stipulations have been entered, but these are not important for the present purpose.

### I.

The first question to be commented on is:

Whether there existed a voidable preference under the Bankruptcy Laws by reason of the transfer in December, 1955, of the notes in question to the escrow agent and, if so, is it a defense which is available to these defendants?

Section 60 of the Bankruptcy Act (11 U.S.C.A. § 96) comes into play in this connection. This section defines a preference as a transfer of property of a debtor to or for the benefit of the creditor for or on account of an antecedent debt made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition. It also requires that the effect of the transfer be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class.

All of the requirements of Section 60 are here satisfied. The only possible question is whether the transfer was to satisfy an antecedent debt. Referring to Section 6302(c) of the Internal Revenue Code, 26 U.S.C.A. § 6302(c), it would appear that an antecedent indebtedness existed on December 6, 1955 (the date on which the escrow agreement was executed) because there was on that date an accrued obligation. The mentioned section required deposit of withholding taxes on a current basis and such deposits had not been made. It follows, therefore, that there was antecedent indebtedness within the meaning of Section 60 of the Bankruptcy Act.

The question remains, however, whether the preference can be utilized by the present defendants as a defense and for the following reasons it would appear that it can not:

*First,* the voidable preference is an equity of ownership of the trustee in bankruptcy and the general rule is that such outstanding claims of ownership can not be asserted by a third person as against a holder in due course. This matter is discussed in Britton, Bills and Notes, § 159, pp. 757, 758. The author points out that if the holder is a holder in due course, the equity of ownership of a third person can not be asserted against him. The author goes on to state that the defendant, relying on an outstanding equity of ownership, must prove affirmatively that the plaintiff was not a holder in due course.

The *second* reason that the defense of voidable preference is not available to a defendant-maker or endorsee is that the bankruptcy act itself contemplates that the trustee alone has the power to avoid the preference and in the case at bar the defendants are in effect seeking to avoid it as third persons to the transaction. The Act itself suggests that the power of avoidance is in the trustee. Section 60, sub. b provides:

"Any such preference may be avoided *by the trustee* if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent." (Emphasis supplied.)

That the action to avoid a preference must be brought by the trustee, or receiver, is indicated by Collier—(3 Collier on Bankruptcy, 1018). The author declares that the right of recovery vested by the Act in the trustee is not even assignable. The following statement makes it clear that the trustee must assert the right:

"The courts have limited the exercise of the right to avoid a preference under § 60b to the trustee himself with few exceptions. Thus the right of recovery vested by the Act in the trustee is not assignable. Nor can a purchaser of the bankrupt's assets require the trustee to proceed with a suit to recover a preference for the purchaser's benefit. And although it is the duty of the trustee to deliver property sold in bank-

ruptcy proceedings to the purchaser, where a trustee has sold property of the bankrupt but has not yet delivered it, he still retains such an interest that he may contest a suit brought to foreclose a mortgage on the property upon the ground that the mortgage was a voidable preference.

"The trustee represents the creditors in all matters pertaining to the bankrupt's property, and they normally have no remedy which will reach such property except through him. Generally speaking, the decision as to whether a suit should be brought lies in the discretion of the trustee. It has been held, however, that if the trustee unjustifiably refuses to sue, a creditor may be permitted to do so for the benefit of all in his stead. But a suit to recover a preferential transfer should be brought in the name of the trustee even though proceedings were pending at that time for his removal and he was unfriendly to the petitioning creditors. * * *"

■ While it is true that creditors could in some instances be authorized to bring the action where the trustee has unjustifiably refused to do so, it is equally clear that the right cannot be exercised under circumstances such as those present here. It is concluded, therefore, that the fact that there exists a voidable preference can not serve the present defendants.

## II.

Negotiability of the notes which are involved in Civil Actions numbered 6198 and 6199.

In Civil Action No. 6199 the controversial language reads: "This note may be renewed for an additional six months provided a substantial payment is made on or before maturity date." The language in No. 6198 is somewhat similar, but in legal effect different. It reads, "Right and understanding that substantial payment can be made and renewed."

It is contended, of course, that these provisions provide for extension of the due dates on the respective notes and render date of payment uncertain resulting in non-negotiability of the notes; the legal consequence of this being that they are unenforceable even in the hand of a holder in due course. Turning to an analysis of the language in these notes, and we first consider the provision in Civil Action No. 6199 allowing a six-month extension in the event of a substantial payment. The pertinent provisions of the Negotiable Instruments Law are sections 1(3) and 4(2) and 4(3), C.R.S. '53, 95-1-1(3), 95-1-4(2, 3). Section 1 provides that for an instrument to be negotiable it must be payable on demand or at a fixed or determinable future time. Section 4 attempts to define a determinable future time as follows:

"(2) On or before a fixed or determinable future time specified therein; or

"(3) On or at a fixed period after the occurrence of a specified event which is certain to happen, though the time of happening be uncertain."

The question is whether a provision for a six-month extension conditioned on the making of a substantial payment renders date of payment uncertain in the light of the above sections.

■ The rule is that where the extension is for a definite period it does not have the effect of destroying negotiability. A good statement appears in Britton, supra, pages 113 and 114 of this text. The author makes this comment:

"* * * If a note is due in one year, but is subject to the maker's conditioned option to extend it one year, the note should be the same as though it provided for payment two years from date subject to call by the maker at the end of one year from date. Such a note should be negotiable under Sec. 4(2).

"Where, however, an instrument which bears a fixed date of maturity confers an option upon the primary obligor to extend the time of pay-

ment to a non-determinable future time or until the happening of a contingency, such an instrument, obviously, is non-negotiable. The question as to what is a non-determinable future time and what is a contingency will be fixed by the cases which deal with these statutory terms as they appear in the acceleration clause and other time of payment cases.

"Extensions of time thus may be forced by the primary obligor under appropriate options given to him in the instrument without destroying negotiability, and conversely, negotiability will be destroyed when the option in the maker to extend is fixed by an act or event which lies in the zone prohibited by the sections just ·referred to."

The important factor is whether the extension is for a definite time. If so, the extension provision does not render the instrument non-negotiable. There are a good many cases which pronounce this principle. See, for example, Longmont National Bank v. Loukonen, 53 Colo. 489, 127 P. 947. But see also National City Bank v. Kirk, 85 Ind.App. 120, 134 N.E. 772, and see the annotation in 77 A.L.R. 1085.

█ In the case at bar the provision would renew the note for one additional six-month period. Therefore, the extension is for a definite period of time and, consequently, this clause does not render the instrument non-negotiable.

█ Turning now to the note in Civil Action No. 6198, and the language, "Right and understanding that substantial payment can be made and renewed," it must be concluded that the indefiniteness of the time of payment renders this instrument non-negotiable. A clew to the correct rule with respect to this language is found in a footnote in Britton's text, on page 114, wherein the author comments on an early Pennsylvania case which contains language similar to that in the instant note. The author declares:

"[1] A note contained the provision: 'This note was given for advancements and it is the understanding it will be renewed at maturity.' Held: non-negotiable in Citizens' Nat. Bank v. Piollet, 1889, 126 Pa. 194, 17 A. 603, 4 L.R.A. 190, 12 Am.St.Rep. 860. If this language could be construed to mean that the note should be renewed for the same period as that originally specified, upon the election of the maker it should be negotiable, for it is but a note for the longer period subject to call at a specified date and clearly negotiable under Sec. 4(2). But if the language permits the maker to extend time of payment for an indefinite time the note should be non-negotiable."

Thus, the correct test would appear to be whether the language allows the maker in his uncontrolled discretion to extend time of payment for an indefinite period. This appears to be the line which the cases take. Thus, in Longmont National Bank v. Loukonen, supra, the Supreme Court of Colorado held time of payment to be certain even though under the terms of the instrument secondary parties agreed to extensions consented to by the maker and the holder. The Court said:

"* * * A definite time when the holder may demand payment is stated, and the period of maturity is fixed. There is nothing in the note which gives the maker, or any one else, a right to demand an extension, or which binds the holder to give it. * * *"

In the case at bar the holder has no such right as that described in the Longmont Bank case. Decisions from other jurisdictions follow a similar line. The Supreme Court of Kansas, in Osborn v. Millikan, 140 Kan. 592, 38 P.2d 104, held a note non-negotiable which permitted either the payee *or* holder to extend the time of payment within limits. The Supreme Court of Kansas said:

"* * * The first part of the sentence above quoted from the note

authorizes the holder, without notice to or consent of the indorser or signers, to extend the time of payment any number of times, provided that the time or times of such extensions does not exceed one year from the maturity of the note, according to its terms. Under this provision it would be possible for the holder of the note to fix any one of a number of dates for the payment of the note. There is no way to tell from reading the note itself what date may be fixed by the holder for its payment. The time of payment, therefore, is uncertain, and the note, by our statute, is nonnegotiable. * * *."

The same view is adopted in the following cases: Union Stockyards Nat. Bank of South Omaha v. Bolan (1908) 14 Idaho 87, 93 P. 508; Smith v. Zabel (1927) 86 Ind.App. 310, 157 N.E. 551; Second Nat. Bank of New Hampton v. Mielitz (1930) 211 Iowa 218, 233 N.W. 108.

In Union Stockyards Nat. Bank, supra, and in Smith v. Zabel, supra, the clause read:

"No extension of time of payment, with or without our knowledge, by the receipt of interest or otherwise, shall release us or either of us from the obligation of payment."

In both of these cases it was held that the instrument is rendered non-negotiable on the ground that a provision giving the payee or the holder authority to extend the time of payment rendered the instrument non-negotiable. Second National Bank case contained a provision whereby makers and endorsers agreed to an extension of time "from time to time by any one of the signers." The Iowa Court held that this rendered the instrument non-negotiable.

A note in 77 A.L.R. 1085, confirms our view that the rule of non-negotiability applies to the instant note. There is a full collection of cases in 77 A.L.R. beginning at 1087, and although there are cases which find negotiability in extension cases, the extension provision is generally one which could be exercised or not at the option of the holder thus rendering time of payment definite in that the holder could demand payment at maturity.

The difficulty with the language in the note at bar is that it does not limit itself to one extension of time— it can be extended infinitely upon the payment of a substantial sum of money. What constitutes a substantial payment is also undetermined. So, the result is that the obligor has by the terms of the instrument the power to extend time of payment indefinitely. This renders the instrument non-negotiable and all defenses available against the original obligee may be asserted against the United States.

III.

Whether in Civil Actions Nos. 6197 and 6216 the deposit of the notes in escrow pursuant to the agreement of the Government and Royal Hotel constituted a purchase as of the date of deposit.

This question is important because the note in No. 6197 had a maturity date of January 16, 1956, and that in No. 6216 had a maturity date of December 28, 1955. As has been previously noted, the notes were delivered to Clifford Jones, escrow holder, on December 6, 1955. Consequently, unless it can be held that the date of the deposit in escrow constituted the time of acquisition by the Government, the acquisitions must be determined to have occurred after maturity. This would mean that the Government could not be a holder in due course as to these two notes since section 52 of the Negotiable Instruments Law, C.R.S. '53, 95–1–52, requires a holder in due course to have become a holder before the instrument became overdue.

Section 16, which contains the requirement of a delivery also provides that where the instrument is in the hands of a holder in due course a valid delivery is conclusively presumed. This proviso does not help the Government because the present problem is not valid delivery but

rather *time* of delivery; whether it was on December 6, 1955, the date of delivery to Jones, the escrow holder, or January 31, 1956, the date when the Government became entitled to possession because of failure of Royal to fulfill the conditions of the escrow. There are very few decisions on this narrow issue and the Government has asked the Court to apply the doctrine of relation back which doctrine is often applied to deeds. 19 American Jurisprudence, Escrow, Section 26. The author of the Am.Jur. article comments that the relation back to first delivery doctrine is a fiction which is resorted to when necessary to give the deed effect to prevent injustice or to effectuate the intention of the parties. He goes on to say that ordinarily title is not changed by an escrow until it is rightfully delivered or until such conditions have arisen that it ought of right be delivered to the grantee. It may well be that there are many cases in which this doctrine should apply; however, no good reason appears in the case at bar for applying it. This is not a testamentary disposition which would be defeated without the application of the fiction; moreover, there is nothing in the escrow contract indicating an intent of the parties that the "purchase" was to have been regarded as complete as of the date of the delivery into escrow.

Referring once again to the Am.Jur. article, the title "Escrow" and to Section 25 thereof, the author states that the better rule is that the vesting takes place when the condition is satisfied rather than when there is an actual delivery. This section is here quoted in full:

"Some courts especially in the older cases, have held that an escrow does not take effect as a fully executed deed until there has been a rightful delivery to the grantee. The more logical position and one approved by numerous authorities and by most of the recent cases is that upon the happening of the event or the performance of the condition upon which manual delivery should be made by the depositary to the grantee, although not in fact physically delivered to him, a deed theretofore in escrow becomes ipso facto the deed of the grantee in whom the title vests, and that thenceforth the depositary or holder is regarded as the mere agent or trustee of the grantee."

There is also a paucity of authority in Colorado on this subject. Counsel for the defendant Gerald Yaw has called our attention to one Court of Appeals case which rejects the doctrine that a deed delivered in escrow finally is effective as of that date. The decision is that in Wolcott v. Johns, 7 Colo.App. 360, 44 P. 675. There the Court of Appeals said: "By the depositing of the papers with Butler, Wolcott and Henderson acquired no interest, legal or equitable in the property; and Johns, no right in the notes." The case of Galvin v. Stokes, 68 Colo. 376, 191 P. 117, recognizes the same doctrine; that is, that no property, legal or equitable, passes to the obligee at the time of the delivery to the escrow holder; that the obligee gains a property interest only after fulfillment of the escrow condition.

The Government has cited two cases in support of its position: Cunningham v. Holmes, 66 Neb. 723, 92 N.W. 1023; Daggett v. Simonds, 173 Mass. 340, 53 N.E. 907, 46 L.R.A. 332. Neither of these decisions treats the instant question. In Cunningham, the important question was whether the plaintiff's knowledge of a defense available against the maker should be considered as of the date of the deposit in escrow or the date of actual delivery to the holder and that question is not here present. Undoubtedly, the Government would be entitled to have its knowledge measured as of the date of the deposit in escrow. It does not follow from this that the note was acquired on this day. Daggett v. Simonds also falls short of determining the present issue. There the question was whether a gift in contemplation of death was effective, i. e., whether the escrow holder was the agent of the grantor or of the grantee.

There is one other problem and that is whether the bankruptcy accelerated the

effective date of acquisition. No authorities have been presented on this subject and the Government should have an opportunity to establish this point if it is possible to do so. It should be understood, however, that this is the Government's burden.

Therefore, subject to the possibility of a holding that the bankruptcy operated to vest title in the Government as of the date of the adjudication, it is the conclusion of the Court that the effective date of acquisition was February 1, 1956. It follows, of course, that the notes in Civil Actions Nos. 6197 and 6216 were overdue as of that date.

### IV.

The Court has considered the numerous other questions raised by the several defendants, including the question of whether the Government had authority to enter this contract; and

Whether by the contract the Government waived its right to enforce payment of the notes by its failure to force compliance by the Royal Hotel of the agreement; and

Whether the Government is a real party in interest; and

Whether the Trustee in Bankruptcy is an indispensable party; and

Whether the title is vested in the Trustee in Bankruptcy so as to deprive this Court of jurisdiction of the subject matter of the suit.

The Court is of the opinion that none of these issues has any merit and that it is not necessary to comment on all of them.

■ As to the question whether the Trustee in Bankruptcy is a real party in interest and is an indispensable party, the Court is of the opinion that the nature of these actions is significant. These are suits on promissory notes and the Government is the holder of each of these notes. Any interest of the Trustee in Bankruptcy is an equitable one (existing, if at all, outside the chain of title in each of the notes) and not a *joint* legal interest as contemplated by Rules 12 and 19 of the Federal Rules of Civil Procedure, 28 U.S.C.A. Moreover, the trustee is not prejudiced by reason of not being a party to this action because it is conceded that the trustee would have no semblance of rights against these defendants since he could not possibly be a holder in due course.

As to the matter of authority of the Government to accept notes on condition that it refrain from exercising its legal rights, the Court is not passing on the validity or sufficiency of the consideration which was given and the defendants will be free to urge this contention in connection with the trial of the issue of due course holding.

As to the matter of whether the title is in the Trustee in Bankruptcy rather than the Government, the Court is unwilling to pass on that. It is of the belief that the Government is entitled to have its rights adjudicated in this action and if it succeeds in establishing that it is a due course holder, the defendants are precluded from asserting the alleged equity of ownership in the trustee; if, however, the Government is not shown to be a due course holder, this equity would become important.

### V.

■ There remains one issue of fact in the several cases and that is whether the Government is a holder in due course. The undisputed facts which have been presented do not conclude this question. This is an issue of fact to be tried by the jury or by the Court and at this trial the burden will be upon the Government to establish each and every element of due course holding pursuant to Section 52 of the N.I.L. At such trial it will not be necessary for the defendants to prove defenses available to them as against the original payees since the Government has admitted that it can recover only if it is able to establish that it is a holder in due course with respect to each note.

### VI.

■ Since the several cases have been reduced to one single factual issue,

there is no reason for not consolidating the several cases for trial, pursuant to Rule 42 of the Federal Rules of Civil Procedure. This rule provides that when actions involving a common question of law or fact are pending, the Court may order a joint hearing, or it may order all the actions consolidated. No good reason has been advanced for requiring the Government to prove that it is a holder in due course in each and every one of these cases because the answer to this question will determine all of them. It is, therefore,

ORDERED that all of the above-entitled actions be consolidated for trial on the mentioned issue of fact. The jury trial and Court trial can be, and will be conducted simultaneously.